UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GLEEN E. ZAYAS-ACOSTA,

Applicant,

v.                                                    CASE NO. 8:20-cv-2793-SDM-AAS

SECRETARY, Department of Corrections,

Respondent.
_____/

## ORDER

Zayas-Acosta applies under 28 U.S.C. § 2254 for a writ of habeas corpus (Docs. 1) and challenges his convictions for heroin trafficking, possession of drug paraphernalia, and resisting arrest without violence, for which Zayas-Acosta is imprisoned for twenty-five years.  Numerous exhibits support the response. (Doc. 7-2)  The respondent admits both that the application is timely (Doc. 7 at 12–13) and that the grounds are exhausted.  (Doc. 7 at 15–44)

## I. BACKGROUND[1]

On October 16, 2014, at a postal facility, a police dog identified a package that smelled like narcotics.  (Doc. 7-2 at 828)  After obtaining a search warrant, detectives opened the package and discovered white powder inside a vacuum cleaner. (Doc. 7-2 at 829–30, 834)  A field test identified the white powder as cocaine.

_____

[1] This summary of the facts derives from the trial transcripts.

(Doc. 7-2 at 834, 1066)  A label on the package identified the sender as Valdo Negron from Puerto Rico and the recipient as Migdalia Perez from Davenport, Florida.  (Doc. 7-2 at 837–38)  The detectives replaced most of the cocaine in the vacuum with another substance and re-packaged the substance and the remaining cocaine with a tracking device.  (Doc. 7-2 at 868–69, 884–85, 897–98)  The detectives obtained a second warrant to search the residence at the recipient's address after delivery of the package.  (Doc. 7-2 at 702)

A detective disguised as a postal worker delivered the package to the residence, and two persons inside the residence accepted the package.  (Doc. 7-2 at 969–70)  Thirty minutes after the delivery, Zayas-Acosta and Luis Ayala arrived and went inside the residence.  (Doc. 7-2 at 854–58, 872–73)  Other persons arrived after Zayas-Acosta and Ayala.  (Doc. 7-2 at 858–61)

Three hours after the delivery, the detectives executed the search warrant of the residence.  (Doc. 7-2 at 850)  Police officers approached the residence and detained Ayala, who was outside.  (Doc. 7-2 at 887, 892)  Zayas-Acosta, who was inside, opened blinds covering a window facing the front of the residence, looked out the window, and quickly closed the blinds.  (Doc. 7-2 at 888–89)

During the search, a detective found Zayas-Acosta hiding in a bathroom closet, wearing a black shirt soiled with white powder, and standing next to a pile of white powder and the package delivered by the detective.  (Doc. 7-2 at 913–15)  Broken pieces of powder appeared in the bathroom, in a hamper in the bathroom, and in a bedroom.  (Doc. 7-2 at 946–49)

In the bedroom, the detective found a digital scale, an opened plastic bag with white residue, a knife, and $32,500.00 in cash.  (Doc. 7-2 at 916–20)

Also in the bedroom, the detective found a bag with items belonging to Zayas-Acosta, including plane tickets, a birth certificate, a social security card, a driver's license, an identification card, a voter registration card, and a prescription bottle.  (Doc. 7-2 at 1095–98, 1105–12)  An address different from the address of the residence where the detectives executed the search warrant appeared on the driver's license and the identification card.  (Doc. 7-2 at 1122)

A field test identified the powder from the bedroom as heroin, and the heroin weighed 153.3 grams.  (Doc. 7-2 at 1049, 1114–15)  A laboratory test identified the powder from the bathroom as heroin, and the heroin weighed 860.13 grams. (Doc. 7-2 at 1007)  The heroin from both the bedroom and the bathroom weighed over a kilogram.  (Doc. 7-2 at 1050–51)  A laboratory test of a swab of Zayas-Acosta's soiled black shirt did not detect the presence of a narcotic. (Doc. 7-2 at 1008–11)

After waiving his constitutional rights, Zayas-Acosta told police that he arrived from Puerto Rico a month earlier; he knew Ayala, who lived at the residence, since childhood; and he stayed at the residence for two weeks.  (Doc. 7-2 at 1167–70) Zayas-Acosta admitted that he touched the knife and the scale that the detectives found in the bedroom next to the white powder but claimed that he used both for food.  (Doc. 7-2 at 1181, 1187–88)

The trial court granted the defense's motion for judgment of acquittal on Count One, a trafficking charge for the cocaine in the vacuum. (Doc. 7-2 at 1195–1215) During closing, the prosecutor argued that the jury should reasonably infer from the evidence that, when police executed the search warrant of the residence, Zayas-Acosta moved some of the heroin from the bedroom to the hamper in the bathroom. (Doc. 7-2 at 1229–31) The jury found Zayas-Acosta guilty of trafficking over twenty-eight grams of heroin, possessing drug paraphernalia, and resisting arrest without violence. (Doc. 7-2 at 16)

## II. <u>STANDARD OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 governs this proceeding. *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210 (11th Cir. 1998). Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. . . . Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 694. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)

("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. A respondent may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court affirmed the denial of Zayas-Acosta's Rule 3.850 motion for post-conviction relief. (Doc. 7-2 at 736) A state appellate court's *per curiam* decision without a written opinion warrants deference under Section 2254(d)(1). *Wright v. Sec'y, Dep't Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002). *Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Zayas-Acosta bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption applies to a finding of fact but not to a mixed determination of law and fact.  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).  Zayas-Acosta's federal application presents the same grounds that he presented to the state court.  The state court's rejection of Zayas-Acosta's claims warrants deference in this federal action. (Doc. 7-2 at 144–46, 443–44)

## III.  INEFFECTIVE ASSISTANCE OF COUNSEL

Zayas-Acosta claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains

that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of

counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668 (1984), the Supreme Court set forth a two-part test
> for analyzing ineffective assistance of counsel claims.
> According to *Strickland*,
>
> > First, the defendant must show that counsel's
> > performance was deficient. This requires showing
> > that counsel made errors so serious that counsel
> > was not functioning as the "counsel" guaranteed
> > the defendant by the Sixth Amendment. Second,
> > the defendant must show that the deficient
> > performance prejudiced the defense. This
> > requires showing that counsel's errors were so
> > serious as to deprive the defendant of a fair trial,
> > a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . .

to address both components of the inquiry if the defendant makes an insufficient

showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to

have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an

actual ineffectiveness claim must judge the reasonableness of counsel's challenged

conduct on the facts of the particular case, viewed as of the time of counsel's

conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances,

the identified acts or omissions were outside the wide range of professionally

competent assistance." 466 U.S. at 690.

Zayas-Acosta must demonstrate that counsel's alleged error prejudiced the

defense because "[a]n error by counsel, even if professionally unreasonable, does not

warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To meet this burden, Zayas-Acosta must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

Zayas-Acosta cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

Because the state court rejected the grounds based on *Strickland*, Zayas-Acosta cannot meet the "contrary to" test in Section 2254(d)(1). (Doc. 7-2 at 144–46,

443–44)  Zayas-Acosta instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.  In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable.  *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001).  The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

## A.  Grounds of IAC Before and During Trial

### Ground One and Ground Six:

Zayas-Acosta asserts that trial counsel deficiently performed by not moving to suppress the cocaine in the vacuum and the heroin and other items in the residence.  (Doc. 1 at 5, 7–8, 22)  He contends that a deficient affidavit supported a search warrant for the package and for the residence.  (Doc. 1 at 7–8, 22)  The post-conviction court denied the claim as follows (Doc. 7-2 at 145) (state court record citations omitted):

> Defendant argues that trial counsel was ineffective for failing to quash the search warrant of the package and of the residence. The Court finds that Defendant lacks standing. The package was addressed to Migdalia Perez at the address that was subsequently searched. As Defendant was not the intended recipient of the package, he has no standing to dispute the legality of its search. Additionally, Defendant did not reside at the residence searched. The residence was rented by Mr. Ayala. Defendant told officers during the taped statement that he did not live there. Officers found two Florida licenses with Defendant's name that listed two different addresses. Defendant told officers that he lived with his mom. As such,

Defendant had no standing to challenge the search warrant of the residence.

A label on the package identified the sender as Valdo Negron from Puerto Rico and the recipient as Migdalia Perez from Davenport, Florida. (Doc. 7-2 at 837–38) During the interrogation, Zayas-Acosta did not claim that he either sent or received the package. (Doc. 7-2 at 1163–85) Because Zayas-Acosta was neither the sender nor the recipient of the package, he lacked a reasonable expectation of privacy in the package. Consequently, the post-conviction court did not unreasonably determine that Zayas-Acosta lacked standing to move to suppress the cocaine in the package. *Rawlings v. Kentucky*, 448 U.S. 98, 104–05 (1980); *United States v. Smith*, 39 F.3d 1143, 1144–45 (11th Cir. 1994) (citing *United States v. McKennon*, 814 F.2d 1539, 1542–44 (11th Cir. 1987)).

However, during the interrogation, Zayas-Acosta told a detective that he traveled from Puerto Rico to Florida a month earlier and stayed for two weeks at the residence where police executed the search warrant (Doc. 7-2 at 1167):

| [Detective:] | Do you have a girlfriend? |
|---|---|
| [Zayas-Acosta:] | (Unintelligible) |
| [Detective:] | Had a girlfriend? Is that what the problem was? |
| [Zayas-Acosta:] | Yeah. |
| [Detective:] | And did she throw you out? |
| [Zayas-Acosta:] | No — a little bit. |
| [Detective:] | Maybe a little bit? And they let you stay here? So, you have been staying here on and off for two weeks? |

| | |
|---|---|
| [Zayas-Acosta:] | On and off for two weeks. |
| [Detective:] | Okay. In Florida? |
| [Zayas-Acosta:] | At this house. |
| [Detective:] | How long have you been in Florida? |
| [Zayas-Acosta:] | I am — (unintelligible) — |
| [Detective:] | Maybe a month? |
| [Zayas-Acosta:] | Okay. |

Zayas-Acosta told the detective that he lived at his mother's home in Puerto Rico and traveled to Florida to visit his girlfriend (Doc. 7-2 at 1168–69):

| | |
|---|---|
| [Detective:] | Okay. So, you have been here from Puerto Rico for about a month? |
| [Zayas-Acosta:] | Yeah — (unintelligible). |
| [Detective:] | Where at — (unintelligible) — |
| [Zayas-Acosta:] | (Unintelligible). |
| [Detective:] | What's the name of the street? |
| [Zayas-Acosta:] | The street? |
| [Detective:] | Yeah. |
| [Zayas-Acosta:] | (Unintelligible) — it's a house. |
| [Detective:] | What's the address on the house? If you — (unintelligible) — |
| [Zayas-Acosta:] | It's my mom's house — (unintelligible) — |
| [Detective:] | Your mother's house? You live with your mother? What's the number? |
| [Zayas-Acosta:] | H1. |
| [Detective:] | H1, on Flamboyames Street? |

| [Zayas-Acosta:] | Flamboyames. F-L-A-M-B-O-Y-A-M-E-S. And have a girlfriend. |
|---|---|
| [Detective:] | Okay. And you live there with your mom? |
| [Zayas-Acosta:] | Yes, sir. |
| [Detective:] | What made you come to Florida, just to visit a girlfriend? |
| [Zayas-Acosta:] | Yeah. |

Zayas-Acosta stated that Ayala, who lived at the residence, was his friend

since childhood (Doc. 7-2 at 1169–70):

| [Detective:] | [ ] How do you know the people that live at this house? |
|---|---|
| [Zayas-Acosta:] | I know them. |
| [Detective:] | How? |
| [Zayas-Acosta:] | From my — Puerto Rico. They lived in the same place — (unintelligible) — do they live in — (unintelligible) — These people? |
| [Detective:] | Yeah. |
| [Zayas-Acosta:] | They just live — (unintelligible) — |
| [Detective:] | So you have known them since you were young? |
| [Zayas-Acosta:] | Yes. |
| [Detective:] | How long have you known them? Which one do you know, since you were young? |
| [Zayas-Acosta:] | Luis. |
| [Detective:] | Luis? |
| [Zayas-Acosta:] | Yeah. |

[Detective:]          Is this Luis's house?

[Zayas-Acosta:]       Ayala?

[Detective:]          And you know Luis Ayala?

[Zayas-Acosta:]       Yeah.

[Detective:]          You guys were raised together?

[Zayas-Acosta:]       (Unintelligible).

The post-conviction court ruled contrary to *Minnesota v. Olson*, 495 U.S. 91 (1990), by determining that Zayas-Acosta lacked standing to challenge the search of the residence. 28 U.S.C. § 2254(d)(1). Also, because Zayas-Acosta told the detective that he stayed at the residence for two weeks (Doc. 7-2 at 1167), the post-conviction court unreasonably determined that Zayas-Acosta did not "reside" at the residence. 28 U.S.C. § 2254(d)(2).

*Olson*, 495 U.S. at 98–100, holds that an overnight guest at a residence has a legitimate expectation of privacy in the residence:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.
>
> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot

- 14 -

> monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. . . .
>
> That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household. . . .

Because the record demonstrates that Zayas-Acosta, who was Ayala's friend, stayed at Ayala's home for two weeks before the search occurred, Zayas-Acosta held a legitimate expectation of privacy in the residence and had standing to challenge the search of the residence. *Olson*, 495 U.S. at 98–100. *United States v. Maxi*, 886 F.3d 1318, 1326 (11th Cir. 2018) ("An overnight guest has a reasonable expectation of privacy in a residence sufficient to establish standing. But a guest present only for a brief commercial transaction does not.") (citations omitted).

Because the post-conviction court ruled contrary to *Olson* and unreasonably determined a fact, the ineffective assistance of claim is reviewed *de novo*. *Madison v. Comm'r, Ala. Dep't Corrs.*, 677 F.3d 1333, 1335–36 (11th Cir. 2012) ("If we determine

that a state court decision is contrary to or an unreasonable application of federal law, we must undertake a *de novo* review of the record.").

Zayas-Acosta asserts that trial counsel deficiently performed by not moving to suppress the heroin and other items in the residence.  (Doc. 1 at 6–7)  He contends that the affidavit supporting the warrant failed to demonstrate that the package delivered to the residence contained cocaine.  (Doc. 1 at 6–7)  He contends that the detective who wrote the affidavit did not know whether the package contained cocaine and that "at the very least, the [affidavit] should have stated that the package was opened and determined to actually contain an illegal narcotic."  (Doc. 1 at 7)

The affidavit supporting the warrant for the search of the residence stated (Doc. 7-2 at 1298):

> Your affiant is a detective [and] deputy sheriff employed by the Polk County Sheriff. . . . For twenty-nine years, your affiant has worked narcotics and their related crimes. For twenty-eight years, your affiant has worked a drug canine. . . . Your affiant is currently assigned to the narcotics unit in the Bureau of Special Investigations. Your affiant has worked seven canines prior to Canine Legion. Legion initially had six hundred hours of narcotics training, and forty-five hours with your affiant. Your affiant has certified with Canine Legion [on] February 11, 2014, under the Guidelines of the North American Police Work Dog Association. Canine Legion has 123 total finds with your affiant. Canine Legion is trained and certified in locating the narcotic scent of cannabis, cocaine base, cocaine hydrochloride, heroin, and methamphetamine.
>
> On October 16, 2014, at 9:00 A.M., your affiant was conducting parcel interdiction at a local parcel distribution center. Your affiant retrieved a box that had a handwritten UPS label. The parcel was addressed to Migdalia Perez, 74 Nevada Loop Road, Davenport, Florida, 33897. The sender information is Osvaldo Negron, La Cuarta Calle C-144, Merceditas, Puerto Rico, 00715. Affiant then placed the parcel on the ground. Your affiant then used K9 Legion to sniff the

> package. He then sniffed around the suspect package and gave
> an alert to a narcotic scent by sitting at the suspect package.
> Due to your affiant's training and experience, the parcel
> contains illegal narcotics. Based on the facts presented, your
> affiant believes that the parcel [with] tracking number
> F0710925463 that is to be delivered to 74 Nevada Loop Road,
> Davenport, Florida, contains evidence of distribution of
> narcotics. If no one at the location of 74 Nevada Loop Road,
> Davenport, Florida, [ ] accept[s] this package, the search
> warrant at the residence will not be executed.

Because the trained police dog identified a package that smelled like narcotics, the affidavit established probable cause that the package contained narcotics. *Florida v. Harris*, 568 U.S. 237, 246–47 (2013) ("[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert.  If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

Also, a detective testified that he disguised himself as a delivery driver, knocked on the door of the residence, and gave the package to two persons inside the residence.  (Doc. 7-2 at 969–70)  Because law enforcement executed the search warrant of the residence only after the delivery of the package (Doc. 7-2 at 870–75), a motion to suppress would not succeed.  *United States v. Grubbs*, 547 U.S. 90, 96 (2006) ("[W]hen an anticipatory warrant is issued, 'the fact that the contraband is not presently located at the place described in the warrant is immaterial, so long as there is probable cause to believe that it will be there when the search warrant is executed.'") (citation omitted).  Consequently, Zayas-Acosta fails to demonstrate both deficient performance and prejudice under *Strickland*.  *Strickland*, 466 U.S.

at 694. *Brewster v. Hetzel*, 913 F.3d 1042, 1056 (11th Cir. 2019) ("Defense counsel, of course, need not make meritless motions or lodge futile objections."). Ground one is denied.

**Ground Two:**

Zayas-Acosta asserts that trial counsel deficiently performed by not objecting to the jury instruction on principal liability. (Doc. 1 at 9–10) He contends that no evidence supported the instruction and that the verdict form should have specified whether the jury found him guilty as a principal. (Doc. 1 at 9–10) The post-conviction court denied the claim as follows (Doc. 7-2 at 144–45) (state court record citations omitted):

> Defendant argues that trial counsel was ineffective for failing to object to the principal instruction as there was no evidence that the Defendant aided and abetted the crime. In the present case, a package of narcotics was delivered to the residence. Shortly after the delivery, Defendant arrived at the residence. Defendant was observed chatting with others who subsequently arrived. When the signal for the take down was given, and the first person was detained, Defendant was observed looking out the window. Defendant was later located in the master closet hiding behind clothes. There was a trail of crumbled narcotics leading from the front door to the master closet. Narcotics were located in the closet with the Defendant. A scale and knife and additional narcotics were in Room A, the room Defendant identified as being his sometimes. Defendant appeared to have narcotics residue on his shirt. The evidence was that someone else resided at the residence and Defendant was not the intended recipient of the delivered package. The Court finds that sufficient evidence was presented to show that the Defendant had a conscious intent that a criminal act be done and performed some act that assisted other persons to commit the crime. The Court finds that the principal instruction was properly given, and that any objection would have been without merit. The Court further finds that it is not necessary for the verdict form to specify whether or not the jury found the Defendant to be a principal.

Whether the trial court appropriately instructed the jury on principal liability is an issue of state law, and a state court's determination of state law receives deference in federal court. *Jones v. Kemp*, 794 F.2d 1536, 1540 (11th Cir. 1986) (citing *Henderson v. Kibbe*, 431 U.S. 145, 153 (1977)).

The trial court instructed the jury on principal liability as follows (Doc. 7-2 at 1267–68):

> [Trial court:]  If a defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if:
>
> 1. The defendant had a conscious intent the criminal act be done;
>
> 2. The defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit the crime.
>
> To be a principal, the defendant does not have to be present when the crime is committed.

"In order to convict an offender as an aider and abettor (principal in the first degree), the state must prove that he (1) assisted the actual perpetrators by doing or saying something that caused, encouraged, assisted, or incited the perpetrators to actually commit the crime, and (2) intended to participate in the crime." *J.V. v. State*, 745 So. 2d 1110, 1111 (Fla. 1st DCA 1999). "If there is no evidence that would support the principals theory, then the reading of the instruction is error." *McGriff v. State*, 12 So. 3d 894, 895 (Fla. 1st DCA 2009). "Mere presence at the scene of an

offense is not sufficient to support a principals instruction." *Hanks v. State*, 43 So. 3d 917, 918 (Fla. 2d DCA 2010).

When police arrived to execute the search warrant of the residence, Zayas-Acosta opened blinds covering a window facing the front of the residence, looked out the window, and quickly closed the blinds.  (Doc. 7-2 at 888–89) A detective found Zayas-Acosta hiding in a closet, standing next to a pile of white powder, and wearing a black shirt soiled with white powder.  (Doc. 7-2 at 914–15) Broken pieces of heroin appeared in a bathroom next to the closet, in a hamper in the bathroom, and in a bedroom.  (Doc. 7-2 at 946–49)  Pieces of heroin trailed from the bedroom to the hamper, and clothes covered the heroin in the hamper.  (Doc. 7-2 at 947–49)  Also in the bedroom, the detective found a digital scale, an opened plastic bag with white residue, a knife, $32,500.00 in cash, and a bag that contained a driver's license, a birth certificate, a social security card, and other documents that belonged to Zayas-Acosta.  (Doc. 7-2 at 1095–95, 1105–12)  Zayas-Acosta told a detective that he stayed at the residence as Ayala's guest and admitted that he touched the knife and the scale.  (Doc. 7-2 at 1167–70, 1187–88)

Even if the heroin belonged to Ayala or another person, a jury could reasonably infer from the evidence that Zayas-Acosta assisted the trafficker by hiding a substantial part of the heroin in the hamper when police executed the search warrant.  Consequently, the evidence supported the instruction on principal liability. *J.V. v. State*, 745 So. 2d 1110, 1111.  *See Staten v. State*, 519 So. 2d 622, 624 (Fla. 1988) ("Under our law, both the actor and those who aid and abet in the

commission of a crime are principals in the first degree. . . . Clearly, the getaway driver who has prior knowledge of the criminal plan and is 'waiting to help the robbers escape' falls into this category and is, therefore, a principal.") (citations omitted).

Also, whether a jury must specifically find that a defendant acted — and was convicted — only as a principal is an issue of state law, and a state court's determination of state law receives deference in federal court. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). The jury found Zayas-Acosta guilty of heroin trafficking and did distinctly specify whether he acted as a principal. (Doc. 7-2 at 16–17) The trial court instructed the jury on principal liability as an alternative theory of guilt. (Doc. 7-2 at 1267–68) Because the jury could reasonably infer from the evidence that Zayas-Acosta acted as a principal, the verdict supported the conviction, and the post-conviction court did not unreasonably deny the claim. *Mungin v. State*, 689 So. 2d 1026, 1030 (Fla. 1995) ("While a general guilty verdict must be set aside where the conviction may have rested on an unconstitutional ground or a legally inadequate theory, reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient.") (citing *Griffin v. United States*, 502 U.S. 46 (1991)). Ground two is denied.

**Ground Three:**

Zayas-Acosta asserts that trial counsel deficiently performed by not arguing at trial that Zayas-Acosta lacked knowledge of the presence of heroin in the residence.

(Doc. 1 at 11–12)  He alleges the following in support of the ground (Doc. 1 at 11–12):

> Petitioner was denied his Sixth and Fourteenth Amendment rights to counsel for failing to request lack of knowledge defense. Petitioner denied having any knowledge of illegal substance[s] in the residence he was visiting. When asked by detectives, Petitioner maintained no knowledge. This placed the knowledge issue in dispute. The State made it an issue by arguing during closing that Petitioner knew about the illegal substance[s].

> Accordingly, defense counsel's failure to request the affirmative defense of lack of knowledge was deficient performance that prejudiced him by denying him his procedural and substantive rights to a reasonable defense that may very well have resulted in an acquittal under the facts of this case.

In his motion for post-conviction relief Zayas-Acosta raised this claim and further asserted that trial counsel deficiently performed by not arguing the affirmative defense that he lacked knowledge of the illicit nature of the narcotics.  (Doc. 7-2 at 93–94)  "Lack of knowledge of the illicit nature of a substance is distinct from lack of knowledge of the presence of the substance."  *Maestas v. State*, 76 So. 3d 991, 994 (Fla. 4th DCA 2011).

The post-conviction court addressed the claim based on lack of knowledge of the illicit nature of the narcotics and did not address the claim, which appears in Zayas-Acosta's federal application, based on the lack of knowledge of the presence of heroin (Doc. 7-2 at 443):

> Defendant argues that trial counsel was ineffective for failing to request the instruction regarding lack of knowledge of illicit nature of substance. The State responded that the theory of defense was lack of possession. If the lack of knowledge instruction had been given, the jury would have been instructed that if Defendant possessed the substance, they could presume

that he knew of the substance's illicit nature. Such an instruction would have contradicted the Defendant's theory of defense. . . . After review of the State's arguments, citations, and attachments to its response, adopted and incorporated herein, the Court agrees.

In response to Zayas-Acosta's motion for post-conviction relief the prosecutor addressed the claim based on lack of knowledge of the illicit nature of the narcotics and did not address the claim, which appears in Zayas-Acosta's federal application, based on the lack of knowledge of the presence of heroin (Doc. 7-2 at 186–88) (state court record citations and bolding omitted):

> Defendant[ ] faults trial counsel for not raising the affirmative defense of lack of knowledge of the illicit nature of the substance, pursuant to § 893.101, Fla. Stat. However, Defendant fails to apprise the Court of the fact that had trial counsel raised the affirmative defense of such lack of knowledge, that statute would have required the trial judge to instruct the jury that:
>
>> [T]he possession of a controlled substance, whether actual or constructive, shall give rise to a permissive presumption that the possessor knew of the illicit nature of the substance. It is the intent of the Legislature that, in those cases where such an affirmative defense is raised, the jury shall be instructed on the permissive presumption provided in this subsection.
>
> § 893.101(3), Fla. Stat. (2016). The record conclusively reflects that trial counsel's defense was premised on his argument that Defendant was neither in actual nor constructive possession of heroin. An instruction to the jury that possession, either actual or constructive, required the jury to presume that Defendant knew the illicit nature of the substance would undercut trial counsel's defense, focused on the total lack of possession, and bolstered the State's closing arguments.
>
> In *Richter*, 131 S. Ct. at 788–89, one claim was analogous; there, in a murder case, the prosecution put on a blood spatter expert, and the defense attorney did not counter with an expert of his own. The Supreme Court observed that deploying

a defense expert would be fraught with the possibility of mishap, as questioning the prosecutor's evidence on that could cause the State to strengthen its case. *See id.* at 790. Such a battle would distract the jury from the truthfulness of the witnesses to matters of esoteric forensic science, and weaken the defense. *See id.* Associate Justice Anthony Kennedy, writing for the majority, observed that:

> [T]o support a defense argument that the prosecution has not proved its case, it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates.

*Id.* Trial counsel's strategy plainly was so focused; his closing argument lays that bare. Trial counsel focused on lack of possession; to shift the focus to knowledge of the illicit nature of the substance — something which the jurors would have been required to presume, assuming possession was proven — would distract from that. Further, to the extent that Defendant claims that the prosecutor argued illicit knowledge, the presumption would have strengthened those arguments.

This case is distinguishable from *Jones v. State*, 857 So. 2d 969, 970–71 (Fla. 2d DCA 2003). There, in a cocaine possession case, the defense counsel questioned the witnesses on the appearance of the substance, thereby placing into issue whether Jones knew of the illicit nature of the substance. *See id.* It therefore represented ineffective assistance not to request an illicit knowledge instruction. *See id.* Key to this is that at the time Jones committed his offense, Section 893.101 was not in effect. *See Jones*, 857 So. 2d 970, 971. There, the jury would not have been instructed to presume illicit knowledge, unlike here, and given that according to Defendant the prosecutor argued illicit knowledge, trial counsel wisely did not bolster the prosecutor's argument with a statutory presumption, given by the trial judge.

Defendant has not shown deficient performance here. Nor has he shown prejudice; again, assuming that the jury found at least constructive possession of heroin, raising the affirmative defense would have caused the jury to be instructed to presume illicit knowledge as well. The jury having decided possession against Defendant, that simply would have bolstered the State's argument. The record conclusively refutes ineffective assistance for failing to pursue an affirmative defense of lack of illicit

knowledge. Defendant's second claim should be denied without hearing.

The respondent admits that the claim in the federal application is exhausted. (Doc. 7 at 26)  "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits — but that presumption can in some limited circumstances be rebutted." *Johnson v. Williams*, 568 U.S. 289, 301 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, Section 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Johnson*, 568 U.S. at 303.

Zayas-Acosta raised the claim based on the lack of knowledge of the presence of heroin in his motion for post-conviction relief (Doc. 7-2 at 93–94) and waived, under Rule 9.141(b)(2)(C), Florida Rules of Appellate Procedure, his right to file a brief on appeal (Doc. 7-2 at 731–32), and the prosecutor did not argue on appeal that Zayas-Acosta failed to preserve the issue by not obtaining a ruling on the claim. Because the state court record demonstrates that the post-conviction court likely overlooked the claim, Zayas-Acosta rebuts the presumption under *Johnson*. Consequently, the claim is reviewed *de novo*.  *See Bester v. Warden*, 836 F.3d 1331, 1337 (11th Cir. 2016) ("In the terms of the *Johnson* decision, the state trial court 'inadvertently overlooked' the actual claim, failing to rule on the merits of it. We therefore must decide the claim *de novo*.") (citing *Johnson*, 568 U.S. at 303). *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can [ ] deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether

AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.").

Zayas-Acosta asserts that trial counsel deficiently performed by not arguing at trial that Zayas-Acosta lacked knowledge of the heroin in the residence. (Doc. 1 at 11–12) A detective found Zayas-Acosta hiding in a closet and standing next to a pile of white powder. (Doc. 7-2 at 914–15) Broken pieces of heroin appeared in a bathroom next to the closet, in a hamper in the bathroom, and in a bedroom. (Doc. 7-2 at 946–49) Pieces of heroin trailed from the bedroom to the hamper, and clothes covered the heroin in the hamper. (Doc. 7-2 at 947–49) In the bedroom, a detective found a digital scale, a bag with white residue, a knife, $32,500.00 in cash, and a bag that contained a driver's license, a birth certificate, a social security card, and other items that belonged to Zayas-Acosta. (Doc. 7-2 at 916–20, 1095–95, 1105–12) Zayas-Acosta admitted that he touched the knife and the scale next to the white powder but claimed that he used both for food. (Doc. 7-2 at 1181, 1187–88) Zayas-Acosta told a detective that he stayed at the residence as Ayala's guest and denied knowing about the cocaine and heroin in the residence. (Doc. 7-2 at 1167–71)

The trial court instructed that the jury may infer Zayas-Acosta's knowledge of the heroin if Zayas-Acosta could view the heroin in a location jointly occupied with other persons (Doc. 7-2 at 1258):

> [Trial court:]     However, you may infer that the
>                    defendant knew of the presence of the
>                    substance and had the ability to control it
>                    if he had joint control over the place

> where the substance was located, and the
> substance was located in a common area
> in plain view and in the presence of the
> defendant.

*Robinson v. State*, 975 So. 2d 593, 595 (Fla. 2d DCA 2008) ("When the premises are in joint possession, the State may prove knowledge by contraband found in plain view in the common areas of the premises.").

Because the evidence demonstrated that Zayas-Acosta could observe the heroin in the jointly occupied residence, and the jury could reasonably infer that Zayas-Acosta moved the heroin from the bedroom to the hamper when police executed the search warrant, an argument based on lack of knowledge of the presence of heroin would not succeed. Also, even if trial counsel argued that Zayas-Acosta lacked knowledge of the presence of heroin, Zayas-Acosta fails to demonstrate a reasonable probability that the outcome would change. Ground three is denied. *Strickland*, 466 U.S. at 694. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("[T]his Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success."); *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

**Ground Four:**

Zayas-Acosta asserts that trial counsel deficiently performed by not objecting to the jury instruction for constructive possession. (Doc. 1 at 14–15) The post-conviction court denied the claim as follows (Doc. 7-2 at 145):

> Defendant argues that trial counsel was ineffective for failing to limit the jury instruction to actual possession and not constructive possession. The Court finds that the instruction for constructive possession was proper. The Defendant was located in a residence, with several other people, and narcotics were found in the master closet where Defendant was hiding. The evidence supports a constructive possession argument.

The information charged Zayas-Acosta with both actual and constructive possession of the heroin.  (Doc. 7-2 at 13)  The trial court instructed the jury on actual and constructive possession as follows (Doc. 7-2 at 1256–58):

> [Trial court:]          There are two ways to exercise control: actual possession and constructive possession.
>
> "Actual possession" means the person is aware of the presence of a substance, and:
>
> A. The substance is in the hand of or on the person;
>
> B. The substance is in a container in the hand of or on the person; or
>
> C. The substance is so close as to be within ready reach and is under the control of the person.
>
> "Constructive possession" means the person is aware of the presence of the substance, the substance is in a place over which the person has control, and the person has the ability to control the substance.
>
> Mere proximity to a substance is not sufficient to establish control over that substance when the substance is in a place the person does not control.
>
> In order to establish the defendant's constructive possession of a substance that was in a place he did not control, the State must prove the defendant:

1. Knew the substance was within his presence; and,

2. Exercised control or ownership over the substance itself.

Possession of a substance may be sole or joint; that is, two or more persons may be aware of the presence of a substance and may jointly exercise control over it. In that case, each of those persons is considered to be in possession of the substance.

If you find that the defendant:

A. Had direct physical custody of the substance; or,

B. Was within ready reach of the substance and the substance was under his control; or,

C. Had exclusive control over the place where the substance was located, you may infer that he was aware of the presence of the substance and had the ability to control it.

If the defendant did not have exclusive control over the place where the substance was located, you may not infer he had knowledge of the presence of the substance or the ability to control it, in the absence of other incriminating evidence.

However, you may infer that the defendant knew of the presence of the substance and had the ability to control it if he had joint control over the place where the substance was located, and the substance was located in a common area in plain view and in the presence of the defendant.

If a prosecutor pursues both actual and constructive possession as alternative theories of guilt, and evidence supports both theories, the trial court must instruct the jury on both theories. *Hadley v. State*, 846 So. 2d 1236, 1237–38 (Fla. 1st DCA 2003). *See Barnett v. State*, 121 So. 3d 643, 646 (Fla. 4th DCA 2013) ("It is the trial judge's responsibility to 'ensure that the jury is fully and correctly instructed as to the applicable law.' The importance of proper jury instructions is particularly critical where the State pursues alternative theories of guilt.") (citations omitted).

Evidence at trial proved that Zayas-Acosta either actually or constructively possessed the heroin. A detective found Zayas-Acosta hiding in a closet and standing next to a pile of white powder. (Doc. 7-2 at 914–15) Broken pieces of heroin appeared in a bathroom next to the closet, a hamper in the bathroom, and a bedroom. (Doc. 7-2 at 946–49) Pieces of heroin trailed from the bedroom to the hamper, and clothes covered the heroin in the hamper. (Doc. 7-2 at 947–49) In the bedroom, a detective found a digital scale, a bag with white residue, a knife, $32,500.00 in cash, and a bag that contained a driver's license, a birth certificate, a social security card, and other items that belonged to Zayas-Acosta. (Doc. 7-2 at 916–20, 1095–95, 1105–12) Zayas-Acosta told a detective that he stayed at the residence as Ayala's guest and admitted that he touched the knife and the scale. (Doc. 7-2 at 1167–70)

Because the jury could reasonably infer from the evidence that Zayas-Acosta either actually possessed the heroin by moving the powder from the bedroom to the hamper or constructively possessed the heroin by both observing the heroin and

exercising control over the bedroom and bathroom, an objection to the instruction for constructive possession would not succeed.  Consequently, the post-conviction court did not unreasonably deny the claim. *Brewster*, 913 F.3d at 1056.  Ground four is denied.

**Ground Five:**

Zayas-Acosta asserts that trial counsel deficiently performed for not moving to exclude the following statement by a detective during a recorded interrogation played for the jury (Doc. 1 at 21):  "I'm going to tell you right now, we saw you. We — yeah, we have been watching you."  The post-conviction court denied the claim as follows (Doc. 7-2 at 145):

> Defendant argues that trial counsel was ineffective for failing to exclude certain items from a taped statement. The Detective told Defendant that "we know a little bit more than we're telling you," and "we have been watching you." The Court finds that these two statements were not objectionable or prejudicial and therefore failure to redact these statements was not error. The Court does not find deficient performance or prejudice.

Whether an objection to a statement by a detective during a recorded interrogation played for the jury would succeed is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure.").

During the recorded interrogation played for the jury, a detective told Zayas-Acosta that police surveilled the residence and saw Zayas-Acosta arrive and enter the residence after the delivery of the package of cocaine (Doc. 7-2 at 1171–72):

| | |
|---|---|
| [Detective:] | Do you have any idea if there's drugs in this house? |
| [Zayas-Acosta:] | No. |
| [Detective:] | You don't have any idea if there's any drugs in this house? If we find any drugs in this house, are any of them yours? |
| [Zayas-Acosta:] | No. |
| [Detective:] | Never? Are they Luis's? |
| [Zayas-Acosta:] | Huh? |
| [Detective:] | Are they Luis's drugs? |
| [Zayas-Acosta:] | I don't know Luis — (unintelligible) — |
| [Detective:] | Okay. Here's what I'm going to tell you. Did you see how quick we came in here? |
| [Zayas-Acosta:] | Uh-huh. |
| [Detective:] | What do you think that means? |
| [Zayas-Acosta:] | (Unintelligible) |
| [Detective:] | Do you think that maybe we know a little bit more than we're telling you? I mean, there's how many houses on this block? And we came to this one. And we sat here. We've been sitting here for a little while, to be honest with you. I started getting tired. So, I think we know a little bit more than we're telling you. Here's the thing. Do you want to help yourself out? Because I want to give you the opportunity to help yourself out. Do you understand me? Do you understand what I'm saying? |
| [Zayas-Acosta:] | Yeah. |
| [Detective:] | I mean, right now, there's — there's — (unintelligible) — a little problem — well, there's a big problem. And everybody is |

|                   | going to get the opportunity to help [themselves]. I mean, is there anything that you think that you need to tell me? Because I'm going to tell you right now, we saw you. We saw you. We — yeah, we have been watching you. |
|-------------------|---|
| [Zayas-Acosta:]   | Here? |
| [Detective:]      | Yes. |
| [Zayas-Acosta:]   | With drugs? |
| [Detective:]      | That's why we're here. There's drugs in this house, is there not? |

"Not everything a detective says to a defendant during a recorded interrogation is unfairly prejudicial . . . ." *Eugene v. State*, 53 So. 3d 1104, 1112 (Fla. 4th DCA 2011).  "[A] jury may hear an interrogating detective's statements about a crime when they provoke a relevant response from the defendant being questioned." *Eugene*, 53 So. 3d at 1112.  Also, "[w]hen placed in 'their proper context,' an interrogating detective's statements to a suspect could be understood by a 'rational jury' to be 'techniques' used by law enforcement officers to secure confessions." *Eugene*, 53 So. 3d at 1112.  "However, a witness's opinion as to the credibility, guilt or innocence of the accused is generally inadmissible, [and] it is especially troublesome when a jury is repeatedly exposed to an interrogating officer's opinion regarding the guilt or innocence of the accused." *Gaines v. State*, 155 So. 3d 1264, 1271 (Fla. 4th DCA 2015) (citations and internal quotations omitted).

Two detectives testified that they surveilled the residence and observed Zayas-Acosta arrive and enter the residence after the delivery of the package of cocaine.  (Doc. 7-2 at 854–58, 872–73)  During the recorded interrogation, the

detective truthfully told Zayas-Acosta (Doc. 7-2 at 1171–72):  "Because I'm going to tell you right now, we saw you.  We saw you.  We — yeah, we have been watching you."  Consequently, an objection to the statement would not succeed, and the post-conviction court did not unreasonably deny the claim.  *Brewster*, 913 F.3d at 1056.  Ground five is denied.

**Ground Seven:**

Zayas-Acosta asserts that trial counsel deficiently performed by not moving to suppress the cocaine and the heroin because of tampering.  (Doc. 1 at 22–24)  The post-conviction court denied the claim as follows (Doc. 7-2 at 443):

> Defendant argues that trial counsel was ineffective for failing to argue a motion to suppress based on tampered evidence. Defendant was acquitted of the cocaine possession charge. As to the heroin, the State argues that even if the presumptive test came back as cocaine, there are several different factors that could affect the results. The State argues that counsel had no basis to argue that Exhibit 11 was tampered with. After review of the State's arguments, citations, and attachments to its response, adopted and incorporated herein, the Court agrees.

In response to Zayas-Acosta's motion for post-conviction relief the prosecutor argued that the claim was meritless as follows (Doc. 7-2 at 189–90) (state court record citations and bolding omitted):

> Defendant[ ] claim[s] that trial counsel should have moved to suppress the heroin because of probable tampering. Defendant claims that law enforcement seized only two bricks of white powdery substance totaling 1,030 grams in weight, testing for cocaine, while Ms. LaFleur tested the substance and learned that it was heroin in the amount of 860.13 grams. He claims that a second test yielded a weight of 963.96 grams, identified as cocaine. He then points out that Detective Harkins obtained a presumptive field test showing heroin. Defendant posits that this is evidence that the narcotics in question were tampered with.

> The record conclusively refutes this claim. Defendant conflates the cocaine seized from the vacuum device mailed to the residence (and for the trafficking of which he was acquitted) with the heroin that Detective Plowden and Detective Van Camp discovered at his very feet when he hid in the closet in the master bedroom and in a nearby laundry hamper. While it is true that, according to Detective Van Camp, the heroin seized presumptively field-tested positive for cocaine as well, the detective acknowledged that field tests are not conclusive, and can be affected by heat. Ms. LeFleur's testimony shows that she tested two exhibits in the laboratory, which were in evidence at trial as State's Exhibits 10 and 11[.] [E]xhibit 10 was cocaine, [ ] the trafficking [of] which Defendant was acquitted by directed verdict, and [E]xhibit 11 was heroin, [ ] the trafficking [of] which Defendant was convicted by his jury. Trial counsel thus had no basis to argue that Exhibit 11 was tampered with, and no good faith basis motion there to make. This claim should be denied without a hearing.

Because the trial court granted the defense's motion for a judgment of acquittal on Count One, a trafficking charge for the cocaine in the vacuum (Doc. 7-2 at 1213–15), Zayas-Acosta cannot demonstrate a reasonable probability that the outcome would change if trial counsel had moved to suppress the cocaine. *Strickland*, 466 U.S. at 694.

Whether a motion to suppress the heroin based on tampering would succeed is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. "'Relevant physical evidence is admissible unless there is an indication of probable tampering.'" *Armstrong v. State*, 73 So. 3d 155, 171 (Fla. 2011) (citation omitted). "In order to demonstrate probable tampering, the party attempting to bar the evidence must show that there was a probability that the evidence was tampered with — the mere possibility is insufficient." *Armstrong*, 73 So. 3d at 171. "Once the party moving to bar the

evidence has met its burden, the burden shifts to the non-moving party to establish a proper chain of custody or submit other evidence that tampering did not occur." *Armstrong*, 73 So. 3d at 171.

Detective Taylor Plowden testified that he collected a broken brick of white powder from the bedroom.  (Doc. 7-2 at 920, 934–35)  In his report, Detective Plowden described the powder as cocaine because he assumed that the powder derived from the cocaine hidden in the vacuum.  (Doc. 7-2 at 937)

Detective Michael Van Camp testified that he collected large pieces of white powder from the bedroom, the bathroom, and the hamper in the bathroom. (Doc. 7-2 at 946–50)  Detective Van Camp testified that a field test identified the powder as cocaine (Doc. 7-2 at 950):

| | |
|---|---|
| [Prosecutor:] | Okay. Now, at some point, did you field test the powdered substance from the bathroom? |
| [Detective:] | Yes, sir. |
| [Prosecutor:] | Okay. Was that using a standard field test? |
| [Detective:] | Yes. Narco test kit number 13. And it tested — at that time it was just a presumptive test, and it tested positive for cocaine. |
| [Prosecutor:] | Okay. Now, are those field tests always correct? |
| [Detective:] | No. They are just presumptive. That's why we always send it off to the lab. |

. . .

| | |
|---|---|
| [Prosecutor:] | Okay. Are there conditions that you're aware of that might affect negatively the effectiveness of a field test? |
| [Detective:] | Yes. I've been told that exposure to high amounts of heat can affect the test kits. I have also been told that they have expiration dates on them. And those type of things can affect a presumptive narcotics test kit. |
| [Prosecutor:] | Could you say for certain in this case the test that you used, what the expiration date was? |
| [Detective:] | No, I could not. And at that point back in 2014, I was relatively new to narcotics in general, having just come from the road. |
| [Prosecutor:] | All right. And any testimony about how much heat it had been exposed to [ ] would be speculation, would you agree? |
| [Detective:] | Yes, sir. I couldn't testify as to what the condition the drug test kits were kept in. |

Sergeant Raymond Brown testified that he received two bags of white powder from Detective Plowden and one bag of white powder from Detective Van Camp, placed each bag in a separate package, and closed the packages with evidence tape. (Doc. 7-2 at 975–79)  Sergeant Brown denied that the packages appeared tampered. (Doc. 7-2 at 975–77, 979)  The trial court admitted into evidence the two bags from Detective Plowden as State's Exhibit 8 and State's Exhibit 9 and the bag from Detective Van Camp as State's Exhibit 11.  (Doc. 7-2 at 976–77, 980)

Junia LeFluer, a crime laboratory analyst, testified that she removed the white powder from the package admitted into evidence as State's Exhibit 11, identified the powder as heroin with a laboratory test, determined that the heroin weighed 860.13

grams, returned the heroin to the package, and re-sealed the package.  (Doc. 7-2 at 1006–07)

Detective Jonathan Harkins testified that he removed the white powder from the package admitted into evidence as State's Exhibit 8 and identified the powder as heroin with a field test.  (Doc. 7-2 at 1113–15)  Sergeant Brown testified that, before placing the package in an evidence locker, he determined that the white powder in the package weighed 153.3 grams.  (Doc. 7-2 at 1049)

Because the prosecutor established a chain of custody for each exhibit that contained heroin, a motion to suppress the heroin based on tampering would not succeed, and the post-conviction court did not unreasonably deny the claim. Ground seven is denied.  *Brewster*, 913 F.3d at 1056.  *Davis v. State*, 788 So. 2d 308, 310 (Fla. 5th DCA 2001) ("To bar the introduction of otherwise relevant evidence due to a gap in the chain of custody, a defendant must show there was a probability of tampering with the evidence.  A mere possibility of tampering is insufficient.").

**Ground Eight:**

Zayas-Acosta asserts that the cumulative effect of all constitutional errors deprived him a fair trial.  (Doc. 1 at 24)  Because no series of errors exists to accumulate, the cumulative-error claim is meritless.  *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012).  Ground eight is denied.

## IV.  CONCLUSION

Zaya-Acosta's application for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk must enter a judgment against Zayas-Acosta and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Zayas-Acosta fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate either the merits of the grounds or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Zayas-Acosta must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on March 7, 2024.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE